The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. We will move on with our third argument of the day. The District Court erred by finding, first, that the Eighth Amendment's excessive fines prohibition doesn't apply to the willful FBAR penalty. Secondly, that the $2.9 million willful FBAR penalty assessed against Mr. Rund is not excessive. May I ask you just a quick question so I understand your argument? You were challenging the aggregate amount of the fine, is that right? Among other things, yes. We're also challenging the fact that the Court decided that there was no genuine issue as to material fact with respect to willfulness. Oh, I'm sorry. As to your excessiveness argument, your claim is that the aggregate amount of $2.9 million is excessive? Under the Eighth Amendment, gross disproportionality analysis. And then finally, that there was no genuine dispute as to material fact, which raised an issue as to which a reasonable jury could find for Mr. Rund. And we think that the best demonstration of the problem with the Court's opinion is the manner in which the penalty was assessed and calculated. The total penalty is $2,915,663. What the IRS does is for the relevant period, in this case there were eight years, they look at all the years and then they find the year with the highest account balances. In this case, it was 2014 and there were five accounts in 2014. Three of those accounts were HSBC accounts. And the balances in those accounts, the aggregate balances, were $2,516,586. Two accounts, two remaining accounts were China Construction Bank, CCB, and the balances were $3,314,000. They added those aggregate amounts and the total was $5,831,325. So 50% of that came up with the penalty. Now, the problem that we have with that is for the HSBC accounts for 2014, for 2013 Mr. Rund reported each one of those accounts, same accounts, same account holders, same account numbers, essentially the same amounts on a timely filed FBAR. It was $2.2 million. So essentially Mr. Rund is being penalized 50% in the subsequent year for a delay, a delay in reporting what he had already fully reported the year before. And we feel that under the holding in Bajikasian, when you look at the conduct, what's the conduct? The wrongful conduct here is a delay in reporting to the government information they already had. What's the harm? The harm is a delay in reporting. I thought Judge Harris had asked you, is your excessiveness argument the total number? And you said yes, but now are you making an excessiveness argument just about that HSBC account? It's per account? It is per account, but it's the total number because the total number, the $2.9 million is derived from the three HSBC accounts and the two CCB accounts. I thought but then the government like takes that and they took that total number and then allocated it among all the violations, right? And it ended up being about like almost 14% of each account in violation per year. That's correct. In other words, they'll take the high balance and then when they take 50% of that, they'll allocate that among all of the periods and all of the accounts for which they allege that there's willful conduct. And it's allocated on a pro rata basis over those periods. Let me make sure what test we're engaging in. Do you agree with the four factors that the government proposed for proportionality in this case? Do you agree with the four factors that they propose in the proportionality test? Well, Your Honor, I think proportionality is going to be governed by Bosch-Cajun and Bosch-Cajun factors. So I think we look at conduct, we look at harm, we would look at the target, what's targeted by the statute and what the maximum penalty would be. Well, that's a little different. What they proposed was the amount of the penalty authorized by Congress, the class of persons that the statute at issue principally targets, the harm resulted from the misconduct, and the comparison with potential criminal penalties. Do you agree with that test? I think that the way I stated it was just another way of saying it. I do agree. Okay. All right. Yes. Yes. So again, in this case, the way the total penalty is calculated includes that HSBC and we think that that clearly runs afoul of the Supreme Court's holding in Bosch-Cajun. I guess I'm not, the emphasis on the way the penalty was calculated, I'm just a little bit confused. The statutory maximum would have been just 50% of every account, right? Well, it's 100, the greater of 100. Yes, I'm sorry. Yes. But instead, the IRS takes a much lesser amount, which they calculate in this kind of complicated way, but given that you're coming in well under the statutory maximum, I'm just not really understanding why it matters precisely how it was calculated. I mean, I take it the IRS policy is sort of a way of saying we're not taking everything we could take here. Here's how we're going to do it instead. So let's take a look at what the government contends here. And what they're saying is that if they had really just gone purely by the statute, the penalty would have been 9.8 million or whatever it was. Do you dispute that? I mean, I didn't think that was disputed. I think yes, if you had added it up, that's what it would have come to. But that's clearly, that's more than double the amount that was ever in any of these accounts. In other words, the most that was in these accounts was $5,831,000. That would be, that would clearly violate the 8th Amendment. So they're not doing Mr. Rund any favors by allocating in this fashion. They're doing themselves favors. They're avoiding or trying to avoid. I mean, there's a pretty strong presumption that when Congress sets a penalty, it's not unconstitutional. And so that any penalty within that range is sort of presumptively constitutional. Well, I asked your Honor, would it be, would it be, I mean, certainly Congress is going to be restrained by the Bill of Rights. Yeah, I'm just saying, do you disagree that there's a presumption that when Congress sets penalties, they're constitutional? There is that presumption. And I think that this is a case which demonstrates that, you know, that presumption is rebuttable. And I think the evidence in this case tends to demonstrate that. I mean, Bozsikasian is, when you look at Bozsikasian, the amount of the forfeiture was $357,000. And it was very clear. The court looked at that and what was the opinion? The opinion was the only loss to the government was loss of information. And in this case, it's not even loss of information. The information had previously been fully reported for the HSBC accounts in 2013. So it was a delay in reporting what had already been reported. So we have our Ahmaud case. And we say that what was really going on for the Supreme Court is that was like a one-time violation. The guy only did it one time. And that's what made the penalty there excessive. But in Ahmaud, we say, look, this guy, he's doing it like over and over again over a course of years. It's a sophisticated series of events. And that's what the difference is. How do you look at Ahmaud case? Well, I think that what's different about the FBAR, particularly if we're talking about a willful FBAR as contrasted with a non-willful FBAR, is that it has to be on an account-by-account basis. And if you look at the non-willful FBAR, the Supreme Court's rule in Bittner that the penalty is limited to $10,000 per year, whereas here we're looking at it on an account-by-account basis. And I think that's the important distinction here, Your Honor. I agree with you, though. That does raise that issue. So just your argument is the manner of calculation. But as to your intent to conceal, we define willful this way. If I may, Your Honor, and I'm glad you asked that, because when we're looking just at this period, 2014, we have a lack of motive. Now, you know, I know that Williams, the Williams Court, which was decided by the Fourth Circuit, says that lack of motive was improperly used by the District Court in the Williams case, because although they knew about the existence of account, they didn't know anything about control, extent of control, amount of funds, et cetera. This case is distinguishable, and I submit that lack of motive here, Mr. Runn had absolutely no motive for concealing the HSBC accounts in 2014, and that would tend to negate any intent to conceal when intent to conceal is a requirement. Well, and my point is that the test for willfulness that we follow is, one, it clearly ought to have the client clearly ought to have known, and, two, there was a grave risk at an accurate time that Beth Barr was not being filed, and he was easily in a position to find it out. Now, did the court below follow that test? Well, I don't think so, Your Honor. You don't think so? I do not, because I think that establishing any of these propositions, you have to have evidence. So, for example, in the Williams case, in the Williams case, what did the court look at? Williams, during his guilty plea allocution, admitted that he had hid the $7 million in his foreign account from his accountant and from the IRS because he didn't want to pay tax on it. In the Horowitz case, they admitted, and they came back to the United States, and they had no reason for these foreign accounts, but they kept them. In contrast, Mr. Runn, there were businesses, these were in corporate names. I see my time has expired, if I could... You can finish your thoughts, sir. Yeah. There's a huge distinction. When Mr. Runn was asked about interactions with accountants, he was asked about what he told his accountant in 2003. Mr. Runn is 74 years old. He's being asked to recall a conversation that occurred 20-plus years ago. His answer was he couldn't remember, but he thought that everybody knew everything, the idea being he never, and there's no evidence that he ever hid anything from his accountants. I know you're past your time, but I want to ask a question about that. Did he ever testify that he always did what his accountants and financial advisors told him to do? I looked, my clerk looked. We couldn't find that testimony, and that's the sort of testimony I would expect if you, I can't remember an exact conversation because it was so long ago, but I know I always did what my accountant advised me to do. Is there testimony to that effect? Well, in his affidavit, there's testimony to that effect that he followed the advice of his accountants. There is, yes. In all instances, or just in particular ones that he identifies in the affidavit? I believe it's in all instances, yes. Can you maybe identify that for me when you stand up again? Yes. That'd be helpful. Yes. Thank you. Great. Thank you. Thank you, Judge Harris, and may it please the Court, Sam Gedge for the amicus. I'd like to pick up on one of your questions, Judge Harris, the idea that if a penalty is within the statutory maximum, there is a presumption of constitutionality. The government, I think, echoes this in their brief by invoking the idea of deference to Congress's judgment in this regard, and I think that might be a little bit misdirected in this kind of case in particular, because in the context of fines or forfeitures that are mandated by statute, in Baja Cajun, for example, the courts had no discretion. They have to issue the forfeiture. There, I think, judges have an ongoing debate about the degree of deference or the presumption of constitutionality that should attach in the context of specific mandatory statutory fines and forfeitures. If you look at Judge Newsom's concurrence from the 11th Circuit, for example, I think there's a good discussion of some of those considerations. I think the calculus, though, is fundamentally different in a case like this one, though, because Congress did not pass a statute saying Richard Rund needs to be penalized $2.9 million. Rather, Congress passed a statute saying we are setting a statutory maximum with the theoretical worst-case offender in mind, and we are leaving it to the executive branch to determine in any particular case what the penalty should be. And in that context, I think a lot of the arguments about presumption of constitutionality, a lot of the arguments from the government about deference to Congress really fall away, because particularly, I think, in the wake of cases like Loper-Bride, it doesn't make a ton of sense, I think, to talk about deferring to the Treasury Department when they're calculating a penalty that just happens to be within Congress's statutory maximum. Basically, under Loper-Bride and those kinds of principles, it just doesn't make a lot of sense to be transporting those sentences of congressional deference over to a decision that's ultimately resting in the discretion of the executive branch. Let me ask you, should criminal forfeiture cases that allege excessive fines use the same proportionality test as in civil cases? So we have taken the position that the gross disproportionality standard is the same. There may be kind of differences at the margins, for example, if, for example, the property owner in a forfeiture case is an innocent owner, there might be considerations about culpability that are less present when the penalty is obviously targeting the wrongdoer. So you answer that question, yes? Yes, with some caveats maybe for specific cases. All right. And I'm trying to get you on the factors, too. Do you agree we have clearly established those four factors? I think that you identified your brief. Do you agree with that? So I don't know that I do entirely, Judge Floyd. So as I understand it, this court has only articulated kind of four enumerated factors in an unpublished decision. Cases like Ahmed or Jalaram talk about it in more of a totality of the circumstances context. And I would, I think, quibble with some of those four factors. For example, the focus on the statutory criminal maximum. I don't think that there's a whole lot of work in evaluating the culpability of a specific offender. And going back to my colloquy with Judge Harris, the statutory maximum tells us a lot about what Congress thought the maximum penalty should be for the theoretical worst case offender. It doesn't tell us a lot, though, about the specific culpability, the level of wrongdoing of the particular defendant in front of you. And the fundamental teaching, I think, of Bajikagian is that that is the real question when we're evaluating the gravity of a particular defendant's offense. Well, if that be the case, if you quibble with them, how are we going to evaluate your actions? Yes. So I think the through-line error in the district court's excessiveness analysis was not so much how it handled any one of those specific factors, though, again, I would kind of take issue with some of those factors. I think the broader error, though, was that at almost every turn, the district court was evaluating Mr. Runn's culpability at a really stratospheric level of abstraction, rather than doing what the Supreme Court did in Bajikagian and looking to Mr. Bajikagian's specific wrongdoing, the degree of harm that he himself caused, where he fell on a relatively broad spectrum of culpability. I think that, in fact, kind of has a special force here, where, at least in Bajikagian, because we're talking about a criminal reporting violation, there was a narrower level of mens rea that might trigger the statute. Here, by contrast, to your point earlier, Judge Floyd, civil willfulness under the Bank Secrecy Act is substantially broader than criminal willfulness. But those factors I asked you about a while ago come from, how did you say it, Bajikagian? Bajikagian, yes. That's where they come from. Well, courts have interpreted Bajikagian to kind of distill factors like that, but I think the fundamental teaching from Bajikagian, which we emphasize in our brief, and I'll emphasize here, is that, basically, your task is to review the totality of the circumstances and focus not on the gravity of the offense at kind of a pretty high level of abstraction, but rather to focus in on the specific culpability of the offender. Are they on the kind of pure heart, empty head end of the spectrum, or are they on the deliberate, knowing violator end of the spectrum? I think there's a question material fact on that here. You ask, what are the actual harms to the public from this particular violation, not writ large, what are the harms that can follow from Bank Secrecy Act violations as a whole? And I think those kinds of, that level of generality issue, I think, is what gives us a lot of concern with the district court's excessiveness analysis here. And really, however the facts cash out in this case, we would urge the court not to replicate that kind of really high level of generality in evaluating excessiveness. I do, if I may, also want to touch briefly on the order of operations question, because I think there are compelling reasons in the Eighth Amendment analysis to decide the first order question first, namely, does the excessive fines clause apply here at all? And there are a couple of reasons for that. The government, of course, suggests that the court can bypass that question, assume without deciding that the clause applies here, and then affirm on excessiveness grounds. I think there are a lot of landmines to doing that on the excessiveness front, but also prolonging uncertainty on the threshold question, I think, is uniquely disruptive here. Could I finish my thought really quickly, Judge Harris? You can more than finish your thought, because I have some questions. OK, well, I'm happy to answer them. You can finish your thought first. Sure. So to my point that leaving that threshold question unresolved, I think, is uniquely disruptive. It follows from the fact, to my point earlier, that unlike with lots of other kinds of civil penalty regimes, unlike criminal fine regimes, the power to actually determine any specific FBAR penalty rests not in an Article III court, but with an executive branch agency. And that agency firmly believes nationwide that the excessive fines places no constraint at all on how it goes about settling penalties in any particular case. So for that reason, I think there's an urgent need here to bring clarity to the question whether the clause applies here at all, not just to bring guidance to the lower federal courts, but also to give guidance to the executive branch agencies that, in the first instance, are the ones deciding, should we be imposing a $9 million penalty or a $2 million penalty? Because right now, they're imposing those fines on lots of people who never actually see the nothing to say about how they exercise their discretion. I'm happy to answer your questions. So on that question of is it a fine at all, I mean, I take it that your position, if we accept your reading of Austin, right, any penalty that goes beyond remediation has any deterrent effect, that's a penalty. I mean, that does mean that all civil penalties are fines now, right? Most of them are, yes, Your Honor. Court said that in Hudson, right? Like, look, every penalty has some deterrent effect. Yeah, I think that's right. And you might be able to kind of conceive of some kinds of things that are maybe misnamed penalties, but that actually are purely compensatory. We can envision some kind of maybe restitution scheme where it really is a dollar-for-dollar situation that might fall into that conception of remedial. But yes, I mean, I think the short answer is yes, when we're talking, like, it's called a penalty for a reason. It penalizes people. It's punishment. Right. And so every fine, every civil penalty is a fine. And in order to avoid an excessiveness problem, every imposition of a civil penalty will be accompanied by something like a sentencing hearing, a criminal sentencing hearing into individual culpability, all of the circumstances. So not necessarily, Judge Harris, in that at least in this circuit, the excessive fines clause has been interpreted as an affirmative defense. So the defendant in a civil penalty action would have to raise it. Okay. Let's say the defendant raises it. Sure. And it would, again, under this circuit's precedent, it would be their burden to kind of establish that there's an excessive fine here. But yes. And I mean, I think realistically, if we're talking about a parking fine, for example, yes, it probably qualifies as a fine. I think there's no world in which, you know, a court's going to say that's excessive. Right. But like your regular agency, civil penalties will pretty much be a thing of the past. I mean, it would just be wholly unworkable, which I mean, it can totally be like a feature and not a bug. But it makes me a little bit nervous as a lower court judge that we would issue an opinion that says, fundamentally, every civil penalty is a fine. And under the excessive fines clause, we're going to have to give every person or company upon which one is imposed something like a criminal sentencing. I mean, I think that's right with the caveat that like in the FBAR context, for example, lots of these FBAR cases don't make it into an Article 3 courtroom to begin with. They drag on for 10 years. The person runs out of money. They can't pay for a lawyer. They just pay up. So I think a lot of these cases don't actually see a judge. I guess I'm thinking more of companies almost than individuals. I feel like a lot of these penalties are being imposed against companies. And, you know, they will definitely pay up and it will become more or less unworkable, I would think. I would disagree that it would be unworkable, Judge Harris, because I think where the excessive fines clause is going to be doing the most work in those hypothetical situations is where you have the federal government or state agencies imposing exorbitant multimillion-dollar penalties. And there, there's already going to be a lot of process, right? Like companies fight when they're trying to get hit with multimillion-dollar penalties. So I think just at the margins, yes, there will be another issue potentially that they can raise. But these are cases that often drag on in the courts regardless. And I do also kind of want to also make the point that I think the excessive fines clause often has its most urgent application, not when it comes to companies that are getting hit with multimillion-dollar fines and it's a drop in the bucket for them. Like, yes, there are those cases. The excessive fines clause has important application. Yeah, I'm not, actually, it's just weird because of my particular experience. I'm not even thinking of those companies. I'm thinking of the smallish companies that will argue, well, I'm thinking of the smaller kind of fly-by-night companies. Sure. I mean, I think, I'm not here to defend fly-by-night companies, but I mean, I think my reaction to that is, like, yes, we actually want courts to be involved when governments are imposing exorbitant penalties. Like I said, it's a feature, not a bug. Right, right. And it really only does come into play when folks actually take advantage of this affirmative defense and, you know, carry the burden that this circuit has said they have to carry. So I'm certainly happy to answer any questions that the court may have. All right. Thank you very much. Good morning, Your Honors. My name is Nishant Kumar. I represent the government. So touching really quickly on the willfulness question that is technically on appeal here, Richard Rund committed a few dozen FBAR violations after he knew what the FBAR was and after he'd already submitted an FBAR for an earlier year. So that makes this case stronger, simpler, more straightforward than Horowitz or a lot of the other recklessness cases that the SDNY collected in its Gentges, G-E-N-T-G-E-S opinion that we cited in the briefs. Because here you have someone who knows about the FBAR and still failed to pursue, you know, information about what he had to put on it. And in Horowitz, for instance, you had courts finding that Horowitz is reckless even after crediting them with genuine ignorance of the FBAR itself. I wanted to address your questions, Judge Rushing, about the possible question and material fact that is kind of bouncing around here. Here's how we see it. No plausible juror, no reasonable juror could find based on the evidence that this kind of, that Mr. Rund told his tax preparers about all these accounts back in a timely manner and was advised time and again not to report them, which is kind of the story that he's saying lurks in, like, the realm of possibility. Because unlike the Horowitzes, he hasn't conclusively said on the record, I never told my tax preparers about these accounts. He's only said, I don't remember. And there's that statement, everybody knew about everything. But if you could take everybody, the evidence that he never told them is that, of course, they were not reported. Back when he came before the Voluntary Disclosure Program in 2010, he wrote a letter explaining his earlier omissions. Nowhere in that letter is it, I actually told my preparers about these accounts and was given the wrong advice. And so you have evidence like that, all of which cuts one way that he never told his preparers. And then you have the statement, everybody knew about everything as the only counterweight. If for a defendant to say everybody knew about everything was kind of a get out of summary judgment free and get to the trial, because that itself creates a reasonable dispute. Well, we're just saying it shouldn't be that. It cannot be that. And so we don't think there's a genuine dispute here that he failed to mention his foreign, these foreign accounts to any of his preparers in a timely way. What is the, or do you know the status of the case in the tax court? And if so, is there a final figure? I do not know the status of it. There is not a final case. So I have no idea what the final figure is. Well, the district court said, I think that he, this particular person caused a significant loss in tax revenues. Where is, I mean, what is the best information in this record about the amount of the lost tax revenues here? So the best information, so if, well, if we're talking, I think the court made that observation and maybe said it, it can't be said that, um, succinctly. Maybe the, we, we think, rephrasing that is, it's Mr. Runn's burden under the excessiveness factors, which is where this came up, to show that his, uh, non-reporting does not correlate to any tax loss. And he certainly cannot meet that burden right now because there has not been a conclusive determination. There was no tax loss. There's a pending tax case where, you know, the government, at least at the beginning, asserted millions of dollars in tax loss. So if... Can I just, because I'm really, I'm like, I'm not a money person, I don't really understand this, but is that, is the idea that he, if he didn't disclose the accounts, he couldn't have been paying taxes on the interest earned by the accounts? So like the starting presumption is there were some taxes here that weren't paid, and if that's not the case, the burden is on him to explain why not disclosing the accounts didn't cause a loss? There's, there's more than that in this case. That would be if there were not a tax court case even proceeding. So we would have to rely on that very, like, bare bones presumption. Were there not a parallel tax court proceeding in which people assigned to determine his tax liability found actually, as far as they know, that he, that there was a lot of unreported interest, a lot of unreported account? Yeah, the income tax, you're correct, Your Honor, would be what would be owed on interest that's accruing in the, on the funds that are in all these multi-million dollar foreign accounts. Okay, the funds themselves, taxes have been paid on the funds. The question is the interest? Sometimes taxes have been paid on the funds. For instance, if, if you are, in the Horowitz's case, they, they only put post-U.S. taxes into the Swiss account in question, and then it grew tax-free. But here, for instance, you had the UBS account where there isn't, there also isn't, Mr. Rund thereby managed to evade taxes at the front end as well, because what it was, was a company, the UBS account got $25,000 a month from the companies that Rund controlled in Hong Kong, so that the Hong Kong companies reported less income per year, so they paid less taxes in Hong Kong, moved money to this account in Switzerland, held by a company, you know, with a puppet board of directors that, that acted in Mr. Rund's orders. So basically, there he had money that hadn't yet really been taxed in Hong Kong, where it was earned, and, or in the U.S., though he could kind of control that, you know, it was a kiddie for him. Unless there are other questions about Mr. Rund's ADHD defense on willfulness, I was going to move to the Eighth Amendment arguments, Your Honors. Okay, so as we proposed in the briefing, we think the doctrine of constitutional avoidance and not answering a constitutional question unless it becomes necessary, should guide this Court to kind of assuming the, assuming but not deciding that civil FBAR penalties are fines, because it's just not a close question on excessiveness. So, and that is a path well trod. The Ninth Circuit in Bustle did that, assume but not decide, and then this isn't excessive. Bustle was regarding the civil FBAR penalties. Then, in regards to other exactions that were challenged under the Eighth Amendment, the D.C. Circuit in Bikundi, the Seventh Circuit in Grasshoff have both, both of which are cited, have taken the approach of let's assume but not decide the fines, the threshold question, move on to excessiveness, because excessiveness is clean cut. Here, as Your Honor mentioned, there's a strong presumption of constitutionality, because the penalty amounts are like a third of the statutory maximum. Where does that come from? Where's, where do I get that principle that it must, we presume that it's constitutional because Congress enacted it? Sure, so, so Bajikadzian sets out a general principle out of like deference to, Congress is the foremost at the forefront of setting remedies for social wrongs. We're going to, there's a presumption of constitutionality. Bajikadzian? And I thought Bajikadzian says, you know, because of that, that we, you know, there's a measure of deference to Congress. We presume that they're acting constitutionally. You know, we're going to want to be careful in these, that because of that, therefore, we are setting the standard for excessiveness at gross disproportionality. Right, like the court wrapped all of that into the standard, and then we apply the gross proportionality standard, but when we do that, we don't add an extra layer of, is this grossly proportional? We're going to defer to Congress on that, right? Like you're kind of adding deference in again. Yes, so understood, Your Honor. So the court, the case, the Fourth Circuit case, I would point the court to is U.S. versus $134,750 in U.S. currency, and it's 535 Fed Appendix 232 in this court, where they talk about the strong presumption of constitutionality as if it's the first factor. That appendix means that doesn't bind me.  Right, okay. So that might have been wrong, and I don't have to follow it. So, yes, Your Honor, and I will say it's unclear what extra work, I had the same question. If you're already, if the baseline requirement for the person challenging the penalty is they have the burden of showing gross disproportionality, like what else does it add to the scale to say also when the government's fine is below the statutory maximum that there's a strong presumption of constitutionality? Is that just saying the same thing in two different ways? It is unclear. We are happy to rely simply on the gross disproportionality requirement and not add some oomph of strong constitutional presumption. But one thing we, yeah, I think that's where we would be happy to leave it. We think, let's, so we don't, having said that, if we move through the Bajikadzian factors, the other factors, and apply, you know, keep in mind that it runs burden. You have the question of whether he is among those targeted by the penalty provision at issue, and on this I just wanted to make one, there's a kind of a potential for error here because of some lack of clarity in Bajikadzian. In Bajikadzian, the court found that Mr. Bajikadzian was not among those targeted by the statute that was at it, the penalizing statute, because the penalty statute was not the Bank Secrecy Act. It was this Corollary Crim Forfeiture 18 U.S.C. 982, and so the court made that comment that that forfeiture act, the section 982, is targeted at drug traffickers and criminals and blah, blah, blah, and not people like Bajikadzian who made just this reporting violation. Here, we're not penalizing him under some far-flung forfeiture statute. The BSA, the same statute that is defining his misconduct, is the one setting out the penalty that we're relying on. In this case, Mr. Rudd is not suspected of money laundering or drug trafficking or anything, is he? No, he is not. No, he is not. I merely meant to say that that observation is in – that doesn't mean he's not targeted by the BSA. The language in Bajikadzian saying Mr. Bajikadzian is not the target of a statute directed at drug traffickers, money launderers, is fine, but it's not the – it's not apposite here because the BSA is targeted at people like Mr. Rudd who will – it's defined the prescribed conduct and defined the penalty for that prescribed conduct. And the 11th Circuit in Schwarzbaum, too, which obviously we don't agree with all parts of it, their decision on the fine question, but on excessiveness, they point this out at page 281 of their decision. I think they kind of talk about how Schwarzbaum is targeted by the BSA, unlike Bajikadzian, who was not targeted by that forfeiture statute. But Mr. Rudd, he's just kind of an off-and-on reporter. Is that – would that be a fair characterization? He reports and then he goes awhile and then he misses and then he reports? That is – that is an accurate summary of one strand of his non-reporting. That's his HSBC account, which is one small part of his non-reporting where he kind of winks in and out. Some years he reports it, then the next year he doesn't, then the next year he does, next year doesn't. There's other accounts where he never reported them until he eventually did the voluntary – so the UBS account held in the name of FEV, I forget what it stands for. It's not that he reported, didn't report, reported. It's that he didn't report, you know, from the time it was opened in 2003 until he filed late FBARs in 2010 for a bunch of years going back. But you contend that his conduct is willful. Just as you compare it to Horowitz, his conduct is willful because he was at least as reckless as the Horowitzes. And also, just to make a point, a lot of the – Mr. Runn's brief appeared to attack the – you know, point out how certain facets of his conduct were plainly inconsistent with an intent to conceal. That may be true, but we're not – the basis of our case isn't that he had an intent to conceal. Like, their statements would carry weight if this was a case of knowing concealment. It is a case of recklessness, so it really doesn't speak one way or the other to whether he was reckless. Turning back to the Eighth Amendment and the Bajikadian factors and going through them with Mr. Runn's burden in mind, the other factor – we then turn to the harm caused by Mr. Runn. And here we think the – we have to discuss a little bit the discovery below, but we think basically the absolute, like, nullity of evidence on this question cuts against Runn because it's his burden to show proof. It seems like really only the IRS knows the harm that they're claiming he caused, right? In terms of both, like, tax dollars and I think you mentioned in your briefs harm in the way of investigation and having to track down this sort of misbehavior. How is he supposed to prove that, and do we have enough in front of us to decide that, or is it something we'd need to send back to the district court? So, we don't think you have to send it back to the district court because we think the absence of information, which I'll explain why that kind of rests with him, cuts dispositively against him. The fact that he doesn't have this information is because – and it would be different if your honors ruled – well, this gets into the practicalities. In the district court, Mr. Runn's discovery said, what does the government contend is, like, the dollar amount of damages it sustained from Mr. Runn's FBAR omissions? We said we do not make a contention one way or the other on that. We're not contending no damages. We're not contending damages. We are essentially refusing to answer this on – So, how is he supposed to find out? On grounds of relevance. If he has the burden, how does he find out? So, in that case, if he really thought – this should have been teed up below in the context that he should have moved to compel as the district court in footnote 19 said, if you think this is relevant, as we move to compel, you move to compel and then you'll get your answer. And then, if the court had ruled – the district court had ruled against him, if he had raised a discovery dispute and the district court had said, no, it's not relevant, you know, you don't – and, therefore, he never got this information, that would be an order that would be folded up into this appeal that Mr. Runn could have challenged. But he simply never pressed for this information. The district court kind of treated it as irrelevant. I don't remember its excessiveness analysis getting into, you know, the dollars of – the court kind of assumed, like, the tax case is still going on. Like, maybe that will resolve and tell us the damage the government claims. So, we would say, regardless of how the district court couched it, I think it did correctly say it like – I think it was footnote 9, page 19 of its order. How the government was – there is no evidence, one way or the other – we'll presume a tax loss, like the district court said, but there's actually no concrete evidence, one way or the other, on the amount of societal harm that Mr. Runn's violation caused. I'm out of time. May I finish my sentence? That would be great. That any – yeah, the fact that no one in this case has a dollar amount, you know, to correspond to Mr. Runn's FBAR violation is – really rests on his shoulders and defeats his excessiveness showing. If I may, this just – we never addressed the threshold fine question, but when we're talking about – I would just ask this court, when it's considering Judge – Justice Gorsuch's, you know, comment that non-punitive penalties are a contradiction in terms, the Supreme Court historically has very much not seen it that way with the customs forfeiture cases, the helper itself talking about double damages plus a fixed fee can be said to do no more than make the government whole. So we think as much as it may surprise the man on the street under the jurisprudence, this civil penalty is nothing more – is no less purely compensatory. The realm of what is purely compensatory is very, very expansive under the Supreme Court's jurisprudence and this falls within that very expansive realm. Thank you, Your Honors. If there are no further questions. Thank you. I'm going to cut you off before you even start because there was one question I did want to ask about the kind of threshold question of is this a fine or not. As I read our decision in Thomas on the income tax penalty, we said that we weren't going to apply the Austin standard, a penalty is a fine unless it's purely remedial, that we wouldn't apply that outside the forfeiture context. And that was a long time ago. It was in 1995. But what Supreme Court case would you point to as having kind of superseded that precedent so that we don't have to follow it? Well, I would think – give me one minute here, Your Honor – the Bajikasian case. But that was a forfeiture case. It was a forfeiture case. And I think that the – Because, you know, our rule on our precedent is that if there's any way at all we can reconcile it with what the Supreme Court is saying, we need to follow our precedent. Okay. Well, I think that the – that case involves tax fraud. And the tax fraud is going to be connected to – in other words, if there's a $1 million deficiency that results from tax fraud, and if we're at the 50 or 75 percent, whatever, that's going to follow along. So that's going to be clearly connected with the damages there. Whereas in this case, as the court points out, if you have $1 million that is not attributable to any malfeasance other than this reporting, failure to provide the information, your penalty is going to be $500,000. If it's $2 million, same facts, only more, no connection to anything that the owner of the account is doing wrong. So there might be ways to distinguish it. Let me just – I asked your able amicus, you know, bottom line is the position that every civil penalty is a fine. And he thought yes, more or less. Do you share that view? I do. Yeah. Yes. Yes. And I see my time. I cut you off. No, no. No, no. Feel free to take a minute or so. Your Honor, I think that we've made our position clear, unless there are any other questions. Thank you very much for your time. Thank you. If you wouldn't mind, we would love it if you would come up so that we can greet you, and then we will hear our last case.
judges: Pamela A. Harris, Allison J. Rushing, Henry F. Floyd